# In the United States Court of Federal Claims

### No. 11-520C
### (Filed Under Seal: September 20, 2012)
### (Reissued:  October 15, 2012)[1]
### (Bid Protest)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * <br> * <br> **AFGHAN AMERICAN ARMY**      * <br> **SERVICES CORPORATION,**    * <br>                          * <br>        **Plaintiff,**        * <br>                          * <br>      **v.**               * <br>                          * <br> **THE UNITED STATES,**      * <br>                          * <br>        **Defendant.**      * <br>                          * <br> * * * * * * * * * * * * * * * * * * * * * * * * * | **Post-award Bid Protest; Responsibility Determination; Supplementation of the Administrative Record; Referral for Proposed Debarment; Withdrawal of Proposed Debarment; Disparate Treatment; Remand**. |

Philip J. Davis, Wiley Rein LLP, 1776 K Street, N.W., Washington, D.C., 20006, for Plaintiff.  Paul F. Khoury, Brian G. Walsh, and William M. Novak, Wiley Rein LLP, 1776 K Street, N.W., Washington, D.C., 20006, of Counsel.

Stuart F. Delery, Jeanne E. Davidson, Kirk T. Manhardt, and Cameron Cohick, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., 20044, for Defendant.  K. Elizabeth Witwer, Commercial Litigation Branch, Civil Division, Department of Justice, and Scott N. Flesch and Bernal Rodriguez, U.S. Army Contract and Fiscal Law Division, Washington, D.C., of Counsel.

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

      In this post-award bid protest, Afghan American Army Services Corporation ("AAA") challenges its nonresponsibility determination and exclusion from the competition in the National Afghan Trucking ("NAT") multiple-award procurement for trucking services in

---

[1] This opinion was issued under seal on September 20, 2012.  The Court invited the parties to submit proposed redactions by October 10, 2012.  No objections or proposed redactions having been received, the Court publishes this opinion in toto, errata corrected.

Afghanistan.  The Army disqualified AAA from receiving an award on the ground that AAA was nonresponsible, a determination AAA seeks to overturn as arbitrary and capricious.   AAA also claims that the Army applied unequal and heightened responsibility requirements to AAA as compared to Anham LLC ("Anham"), a contractor that was deemed responsible and awarded a NAT contract.  AAA seeks a permanent injunction remanding its responsibility determination to the Army for a reevaluation.

This matter comes before the Court on the parties' cross-motions for judgment on the administrative record ("AR") and Plaintiff's request for a permanent injunction.[2] The Court concludes that the contracting officer erred in relying on a referral for proposed debarment based upon alleged forgeries by AAA in finding AAA nonresponsible.  Because this error tainted the responsibility determination, this matter is remanded to the Army for a reevaluation of AAA's responsibility without reference to the alleged forgeries or the notice of proposed debarment.[3]

### **Findings of Fact[4]**

### **The Solicitation**

On February 22, 2011, the Army issued solicitation number W91B4N-11-R-5000 for NAT services in Afghanistan.  The purpose of the NAT contract was to provide a secure and reliable means of distributing reconstruction material, security equipment, fuel, miscellaneous

---

[2]  Plaintiff also seeks to supplement the AR.

Defendant's cross-motion for judgment on the AR was styled in the alternative as a motion to dismiss based on the Army's referral of AAA for debarment to the Army Suspension and Debarment Officer ("SDO").   After the SDO withdrew AAA's proposed debarment, Defendant's motion to dismiss was rendered moot.  Tr. 5, June 18, 2012.

Plaintiff was granted leave to amend the pleadings to include an allegation of disparate treatment.  The Government subsequently filed an amended AR, containing some classified material.  Plaintiff filed a motion for judgment on the amended AR on July 26, 2012, and Defendant filed a response to Plaintiff's motion and a classified appendix on August 9, 2012.  Briefing was completed on August 21, 2012.

[3]  The Government also conceded that the contracting officer erred in concluding there was reoccurrence of transponder stacking -- a matter this Court deems insufficient standing alone to warrant either sustaining the protest or ordering a reevaluation of AAA's responsibility.  Nonetheless, in conducting the reevaluation the contracting officer is directed to acknowledge that there was only one instance of transponder stacking.

[4]  The findings of fact are derived from the unclassified and classified portions of the administrative record. Citations to "AR" are to specified pages in the unclassified portions of the administrative record. Citations to "AAA" are to specified pages in the redacted portions of the classified administrative record.

dry cargo, and life support assets to forward operating bases and distribution sites throughout the combined joint operations area in Afghanistan. The Army anticipated the award of indefinite delivery/indefinite quantity contracts for trucking services in three suites: Suite 1 for bulk fuel, Suite 2 for dry cargo, and Suite 3 for heavy cargo. AR 393. The NAT procurement was essentially a follow-on procurement to the prior Host Nation Trucking ("HNT") contract, which had covered substantially the same mission requirements. The Army awarded NAT contracts to 20 contractors, none of whom were HNT contractors.[5]

The solicitation stated that the Army would make awards based on Federal Acquisition Regulation ("FAR") 15.101-2, "lowest price technically acceptable."[6] Proposals were to be evaluated using two criteria: technical capability and price. AR 394. The solicitation stated that the Government would evaluate offerors for responsibility in accordance with FAR 9.1. AR 398. FAR 9.104-1 provides:

To be determined responsible, a prospective contractor must—

(a)     Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104-3(a));

(b)     Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(c)     Have a satisfactory performance record (see 48 CFR 9.104-3(b) and part 42, subpart 42.15) . . . ;

(d)     Have a satisfactory record of integrity and business ethics (for example, see Subpart 42.15).

(e)     Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104-3(a));

(f)     Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104-3(a)); and

---

[5]  One HNT contractor, Anham, was subsequently awarded a NAT contract on February 7, 2012, after it was evaluated for responsibility following the settlement of its bid protest. See J. Stipulation of Facts Regarding Contracting Officer Decl. ¶ 2, Apr. 27, 2012.

[6]  All references to the FAR are to Title 48 of the Code of Federal Regulations as codified at the time of AAA's responsibility determination on August 9, 2011.

(g)     Be otherwise qualified and eligible to receive an award under applicable laws and regulations . . . .

## Submission of Proposals

AAA timely submitted its proposal on April 8, 2011, for all three NAT suites.  See AR 425-692.  On July 29, 2011, the Army eliminated all bidders whose proposals failed either the technical or price requirements, and forwarded the remaining proposals for determinations of responsibility.  AR 1133-53.  By letter dated July 30, 2011, the contracting officer informed AAA that its responsibility evaluation was ongoing and listed several areas of concern relating to AAA's performance of the HNT contract.  The contracting officer requested that AAA provide responses addressing the circumstances giving rise to the area of concern, identifying any mitigating circumstances, and outlining the corrective action taken to prevent reoccurrence.  AR 993-94.    Adverse information involved noncompliance with In-Transit Visibility ("ITV") contract requirements, transponder stacking,[7] failure to meet Private Security Contractor ("PSC") Arming requirements, and withholding of contract payments for failed missions, canceled no-pay missions, pilferage/backcharges, and fuel backcharges.    Id.  The letter also stated that "reoccurring instances of submission of forged Transportation Movement Requests (TMRs) have been reported throughout the life of the contract."  AR 994.  In describing this adverse information, the contracting officer cited letters of concern issued to AAA dated February 1, 2010, May 1, 2010, May 11, 2010, October 1, 2010, March 1, 2011, April 18, 2011, and May 14, 2011.  AR 993-94.  The contracting officer also cited two cure notices issued to AAA dated July 1, 2011, and July 2, 2011.  Id.  With the exception of the allegations regarding forged TMRs, the Army had raised each of these performance problems with AAA during its performance of the HNT contract.  See AR 995-1103.  The Army had never mentioned alleged forgeries to AAA during HNT performance.  AR 1007-08.

In a subsequent letter, the contracting officer informed AAA of an additional area of concern regarding AAA's performance on the HNT contract -- an alleged instance of bribery involving an email allegedly sent by AAA's CEO appearing to offer payment to government officials in return for a contract award.  See AR 1104.

On August 2, 2011, AAA responded to the contracting officer's notice of the ongoing responsibility evaluation, detailing the relevant circumstances, mitigating factors, and corrective action taken or proposed to be taken with respect to each area of concern raised by the contracting officer.  AR 995-1009.  On August 3, 2011, AAA also responded to the contracting officer's letter notifying AAA of the allegation that AAA's CEO had proposed to bribe

---

[7] As defined in AAA's responsibility determination, "[t]ransponder stacking is the activation of multiple [Global Distribution Management System ("GDMS")] transponders without having a delivery truck assigned to each."  AR 1158.  It involves placing multiple transponders in a truck to make it appear that the truck is making multiple deliveries.  Id.  "The result of activating multiple transponders is false entitlements, such as half pays, demurrage fees, or being placed higher on the HNT Order-of-Merit List (OML)."  Id.

government officials in an email.  AR 1105-07.  In a declaration attached to AAA's response, AAA's CEO denied ever offering a bribe in exchange for contract award.  AR 1131-32.

**The Nonresponsibility Determination**

On August 9, 2011, Army contracting officer Salia J. Price found that AAA was nonresponsible, relying on AAA's performance of the HNT contract, corrective action taken by AAA, and her assessment of AAA's responsibility for each requirement enumerated in FAR 9.104.  AR 1154-62.

### AAA's Inability to Meet the Delivery or Performance Schedule

Applying the individual sections of FAR 9.104-1, the contracting officer first determined that AAA did not meet the requirements of FAR 9.104-1(b), which provides that the prospective contractor must "[b]e able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments."  The contracting officer stated:

> There is evidence that AAA's repeated failure to comply with the terms and conditions of contract number W91B4N-10-D-5000 inhibited compliance with the required delivery and performance requirements when performing Host Nation Trucking (HNT) in Afghanistan.  Specifically two (2) Letters of Concern were issued for failure to meet Private Security Contractor Arming Requirements, dated 1 Feb 2010 and 14 May 2011; one (1) Cure Notice was issued for failure to meet Private Security Contractor Arming Requirements, dated 1 Jul 2011; and repeated instances of failed missions.  These events demonstrate a systemic trend in failing to comply with significant contract requirements which include critical areas of security and safety which directly impact compliance with required schedule and performance requirements.  Contractors under the HNT contract cannot perform individual transportation missions unless compliance with arming and associated training requirements and utilization of authorized PSC firms are demonstrated.    AAA's history of non-compliance with submission of deliverables, inability to properly manage its employees and subcontractors, including the Private Security Contractor, and its failure to implement effective corrective action which prevented reoccurrence do not support a determination that AAA will be able to comply with the required delivery and performance requirements under the NAT requirement.

AR 1156.

**AAA's Lack of a Satisfactory Performance Record**

The contracting officer also found that AAA did not satisfy the requirements of FAR 9.104-1(c), which requires prospective contractors to "[h]ave a satisfactory performance record." The contracting officer stated:

> AAA failed to comply with the requirements of the Statement of Work (SOW) of the [HNT] contract on several occasions.  At a minimum, and after being notified on three (3) occasions, AAA failed to comply with the Private Security Contractor Arming requirements, particularly, non-compliance with providing correct and complete armed employee authorization packages and registration in the Synchronized Predeployment Operational Tracker (SPOT) database.
>
> . . .
>
> Multiple failures to comply with the HNT SOW requirements led to millions of dollars being withheld for a combination of failed missions, cancelled-no pay missions, pilferage/back charges and fuel back charges . . . throughout the period of performance of its current trucking contract.  The cancelled missions due to failure to comply with the SOW requirements exposed Afghan and American Service members to unnecessary risk.  AAA has demonstrated current ongoing systemic failures in meeting the terms and conditions of the HNT contract.

AR 1157.

**AAA's Lack of a Satisfactory Record of Integrity and Business Ethics**

Additionally, the contracting officer found that, for several reasons, AAA did not satisfy FAR 9.104-1(d)'s requirement that the prospective contractor "[h]ave a satisfactory record of integrity and business ethics."  AR 1157-59.  First, the contracting officer noted that AAA had received four letters of concern and a cure notice regarding noncompliance with requirements for use of ITV devices.  AR 1157-58.  "ITV" refers to a tracking system that monitors a vehicle through a satellite-based GPS device attached to the vehicle itself.  See AR 11337.  The HNT Statement of Work ("SOW"), Section 2.10, stated that "[a]ll vehicles used in support of HNT missions must have a tracking device . . . ."  Id.  Pursuant to this requirement, contractors were expected to install ITV transponders that "ping" in periodic intervals so that trucks could be tracked during HNT contract missions.  Id.  Although ITV transponders made trucks a target for insurgents because they readily identified them as being associated with the U.S. military, the Army required trucks to have installed ITV transponders at all times during a mission -- a 100% ITV utilization rate.  Id.

In AAA's determination of nonresponsibility, the contracting officer stated that the Army had notified AAA of its failure to comply with the contract's ITV utilization rate requirement.  AR 1157-58.  The contracting officer also noted that "[d]espite AAA's proposed corrective

6

actions to address this area of concern including review of its Quality Control Plan, plans to repair or replace inoperable ITV's, adjusting internal staffing and training of ITV, these proposed actions did not prevent reoccurrence." AR 1158.

Second, the contracting officer found that AAA lacked business ethics and integrity due to transponder stacking. The contracting officer cited a March 1, 2011 letter stating that AAA had engaged in transponder stacking. AR 1158. According to the contracting officer, "AAA's . . . implementation of corrective actions . . . did not prevent reoccurrence of transponder stacking months later which led to the issuance of the 2 Jul 2011 Cure Notice."[8] Id.

Third, the contracting officer noted that "[a] total amount of $2,971,786.10 has been withheld for a combination of failed missions, Cancelled No Pay Missions, Pilferage/ Backcharges and Fuel Backcharges under [the HNT contract], of which $2,757,586.10 is specifically attributed to AAA's performance failures." Id.

Fourth, the contracting officer noted that there had been reoccurring submissions of forged TMRs under the HNT contract and that AAA had been referred for proposed debarment based on "numerous acts of criminal misconduct such as forgery and false claims . . . ." AR 1159. The responsibility determination further stated that AAA's implementation of corrective plans did not prevent the repeated offenses over the last two years. Id.

The referral for proposed debarment, dated July 13, 2011, referenced an allegation that AAA had forged TMRs during its performance of the HNT contract. AR 1224-27. The referral based the forgery allegation on affidavits from soldiers and civilians in Afghanistan claiming receipt of fictiously executed TMRs. AR 1230. The referral for proposed debarment contained the following paragraph under the heading "Nature of potential fraud:"

IAW FAR 9.406-2 (a) [5] "Commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, violating Federal criminal tax laws, or receiving stolen property . . . ." AAA has violated US Federal criminal statutes, but may not be prosecuted criminally by the US Department of Justice due to lack of jurisdiction over Afghan nationals and Afghan companies. However, the evidence supporting criminal misconduct supports administrative action to suspend or debar the corporate entity from contracting with the US Government.

AR 1225. The referral further stated:

A complete summary of all pertinent evidence and the status of any legal proceedings involving the contractor: None known at this time involving AAA,

_____

[8] The Government has admitted that the contracting officer's finding of "reoccurrence" of transponder stacking was an error. Def.'s Mot. for J. upon the Admin. R. 31. AAA engaged in one instance of transponder stacking. Id.

but DOJ has jurisdiction as AAA is a US-Afghan joint venture. [Task Force] 2010 will coordinate with DOJ attorneys in the CJOA-A to inform them of this case involving a jointly-owned US company.

AR 1226.

The referral for debarment referenced the "Interim Criminal Investigation (CID) Report of Investigation dated 8 April 2011," which is included in the AR. AR 1224. The CID report stated:

On 7 April 2011, this office obtained copies of sworn statements[9] and forged transportation movement requests (TMR) from the 313th [Movement Control Battalion ("MCB")], which had been originated at various military bases throughout Afghanistan. The documents received detailed non-receipt of fuel and fictitiously executed TMR's that were provided by the companies to the US Govt for payment. The 313th MCB obtained sworn statements from the soldiers and civilians at various military installations throughout Afghanistan responsible for the receipt of fuel, attesting to the fact that numerous TMR fuel deliveries were never received and the TMR documents had been fictitiously executed as complete without their knowledge.

. . .

It was established that AAA submitted 124 forged TMR's for a total value of approximately $3,660,000.

AR 1230.

In determining AAA nonresponsible for lacking a satisfactory record of integrity and business ethics, the contracting officer found:

The following are a listing of the events that impact AAA's Integrity and Business Ethics and show a systemic pattern of fraudulent behavior and activity: . . .

d) As provided in paragraph e, below, reported reoccurring instances of submission of forged TMRs under [the HNT contract] demonstrates AAA's integrity issues and lack of business ethics. AAA's implementation of corrective plans did not prevent the repeated offenses over the last two years and further

---

9   There were seven sworn statements executed between February 28, 2011, and April 17, 2011.  Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for J. on the Admin. R. ("Pl.'s Reply") Ex. 1.

validates AAA's inability to successfully manage its employees and subcontractors.

e) On 13 Jul 2011 a referral for proposed debarment of AAA was submitted by [a military task force] based on what they cited as numerous acts of criminal misconduct such as forgery and false claims, and violations of Title 18 USC 495 and 287[10] in performance under contract W91B4N-10-D-5000[.]  [This] further substantiates AAA's integrity issues and lack of business ethics.

AR 1159.

The contracting officer also stated in the responsibility determination that she had notified AAA by letter dated July 30, 2011, of adverse information regarding AAA's performance of its HNT contract, including "reoccurring instances of [reported] submission of forged Transportation Movement Requests (TMRs) . . . throughout the life of the contract."  AR 1155-56.  In her letter dated July 30, 2011, the contracting officer requested further information from AAA regarding the forged TMRs.  See AR 993-94.  By letter dated August 2, 2011, providing its response to this concern, AAA advised the contracting officer that alleged forgery had never been mentioned during the HNT contract, stating:

> [T]his is the first time that AAA has received any notice of any concerns regarding "forged Transportation Movement Requests (TMRs)."  AAA—including its management and employees—has no knowledge of any instances or allegations of forged TMRs.  AAA is thus surprised with the assertion that there have been "reoccurring instances" of forged TMRs "throughout the life of the contract."

AR 1008.  AAA sought clarification from the contracting officer and requested "any details or other information regarding [the allegations]" so that it could "undertake an appropriate investigation."  Id.  The contracting officer did not respond to AAA's request.

Finally, in her responsibility determination, the contracting officer detailed an allegation of bribery arising from the HNT contracting officer's receipt of an email proposing to offer a bribe in exchange for contract award that appeared to have been sent from the email address of AAA's CEO.  AR 1159.  AAA's CEO denied ever offering a bribe in exchange for a contract.  AR 1105-32.  In a declaration submitted in response to the contracting officer's August 2, 2011 letter, the CEO claimed that his commercial email account had been compromised and that the offer of a bribe was sent by an unauthorized user of the account.  AR 1131-32.  The contracting

---

[10] 18 U.S.C. § 495 (2006) prohibits the act of forging a writing for the purpose of obtaining or receiving a sum of money from the United States or its officers or agents.

18 U.S.C. § 287 (2006) prohibits the act of making or presenting to any officer in the civil or military service of the United States, or to any department or agency, any claim upon the United States knowing that the claim is "false, fictitious, or fraudulent."

officer found that AAA lacked business ethics and integrity, however, because AAA's CEO had not subsequently changed his email address as a means to prevent future unauthorized access. AR 1159.

### AAA's Lack of Organization, Experience, Accounting and Operational Controls, and Technical Skills

The contracting officer also found that AAA did not "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them" as required by FAR 9.104-1(e). AR 1159. In support of this conclusion, the contracting officer reiterated AAA's history of noncompliance with PSC requirements and failure to "improve GDMS utilization rates," which resulted in the issuance of four letters of concern to AAA. AR 1160. Additionally, the contracting officer referred to a May 2010 letter of concern "citing that the Government made repeated attempts to contact AAA's Operation Center via phone and email that were unsuccessful and fourteen (14) trucks failed to arrive at mission origination points." AR 1159-60. In conclusion, the contracting officer stated: "All of these examples are indicative of a lack of quality assurance and operational controls. Further, AAA's lack of compliance with PSC arming requirements does not provide the Government confidence in AAA's safety programs." AR 1160.

### Anham's Responsibility Determination

Like AAA, Anham provided trucking services in Afghanistan under the HNT contract. AAA 2. In 2011, Anham submitted a proposal for Suites 2 and 3 of the NAT contract. AR 25058-267. Initially, Anham was excluded from the competitive range because its proposal failed to meet the solicitation's technical requirements. Consequently, the contracting officer did not initially make a responsibility determination for Anham.

On September 30, 2011, Anham filed suit in this Court challenging its exclusion from the competitive range in the NAT procurement. Subsequently, Anham entered into a settlement agreement with the Government, and the parties stipulated to the dismissal of Anham's suit. See Stipulation of Dismissal with Prejudice, Anham, LLC v. United States, No. 11-515C (Fed. Cl. Sept. 30, 2011). Pursuant to the settlement agreement, the Government agreed to resume evaluation of Anham's proposal. Id. Based on this reevaluation, Army Contracting Officer Dale Van Dyke determined that Anham was responsible on February 2, 2012. J. Stipulation of Facts Regarding Contracting Officer Decl. ¶ 1, Apr. 27, 2012. Five days later, on February 7, 2012, the Army awarded Anham a NAT contract. Id. at ¶ 2.

On June 18, 2012, the Court granted AAA leave to amend its pleadings to include allegations that the contracting officer had engaged in disparate treatment by deeming AAA nonresponsible and Anham responsible. On June 25, 2012, the Government filed an amended AR, containing both classified and nonclassified material. On July 26, 2012, Plaintiff filed a motion for judgment on the amended AR and a classified appendix addressing disparate treatment. Defendant filed a response to Plaintiff's motion and a classified appendix on August

9, 2012.  The parties completed supplemental briefing regarding Plaintiff's disparate treatment allegations on August 21, 2012.[11]

## Discussion

## Jurisdiction and Standard of Review

The Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2006).  In a bid protest, the Court reviews an agency's procurement decision under the standards enunciated in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2006). 28 U.S.C. § 1491(b)(4) (2006); see also Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1373 (Fed. Cir. 2009).  Pursuant to the APA, this Court may set aside an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Ala. Aircraft Indus., 586 F.3d at 1373.

An agency action is arbitrary and capricious when the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 302 (2011) (quoting Ala. Aircraft Indus., 586 F.3d at 1375).  An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  In re Sang-Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

"Contracting officers are afforded considerable discretion in negotiated procurements, such as this one, where award is premised on a 'best value' determination."  Ceres Envtl. Servs., Inc., 97 Fed. Cl. at 302 (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004)).  Importantly, "[c]ontracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination."  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334-35 (Fed. Cir. 2001) (quoting John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999)); see also News Printing Co., Inc. v. United States, 46 Fed. Cl. 740, 746 (2000) ("'A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance.'") (quoting House of Commc'ns & Graphics, B-245920, 1992 WL 55054, at *2 (Comp. Gen. Mar. 4, 1992)).  "When such decisions have a rational basis and are supported by the record, they will be upheld."  Bender Shipbuilding & Repair Co., Inc. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002).  Plaintiff has the burden of establishing that the responsibility determination was arbitrary and capricious.  Impresa, 238 F.3d at 1337.

---

[11]  As a result of a colloquy during oral argument, the parties submitted additional briefing regarding the scope of the relief requested in this matter.

In resolving bid protests, the trial court is to make findings of fact weighing the evidence in the AR. See Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005). If the protester succeeds in demonstrating an error in the procurement process, the Court then proceeds to determine, as a factual matter, whether the protestor was prejudiced by the error.

## Supplementation of the AR

AAA seeks leave to supplement the AR with several documents relating to the termination of its proposed debarment -- the decision of the Army Suspension and Debarment Officer ("SDO") terminating the proposed debarment, AAA's Response to the Notice of Proposed Debarment, its slide presentation to the SDO, and documents cited in its Response to Notice of Proposed Debarment.

As the United States Court of Appeals for the Federal Circuit recognized in Axiom Resource Management, Inc. v. United States, supplementation of the record in a bid protest should be limited to cases in which "'the omission of extra-record evidence precludes effective judicial review.'" 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)). Plaintiff claims that these extra-record materials are necessary for effective judicial review because, in her responsibility determination, the contracting officer relied on unverified allegations in the proposed debarment that AAA forged TMRs, credited these allegations of forgery, and prevented AAA from providing a response to these allegations. Pl.'s Mot. to Supplement the Admin. R. 2, 4-5. As such, Plaintiff contends the record is incomplete as it does not include all relevant information pertaining to the forgery allegations.

In her responsibility determination, the contracting officer cited AAA's referral for proposed debarment based upon allegations that it had forged TMRs during performance of the HNT contract as one reason for her conclusion that AAA lacked integrity and business ethics. AR 1159. During performance of the HNT contract, AAA had never been notified of allegations of forged TMRs. AR 1008. It was only when AAA received the contracting officer's letter notifying AAA of the ongoing NAT responsibility evaluation, that AAA became aware of these forgery allegations. Id. In response to this letter, AAA advised the contracting officer that alleged forgery had never been mentioned during the HNT contract, stating:

> [T]his is the first time that AAA has received any notice of any concerns regarding "forged Transportation Movement Requests (TMRs)." AAA— including its management and employees— has no knowledge of any instances or allegations of forged TMRs. AAA is thus surprised with the assertion that there have been "reoccurring instances" of forged TMRs "throughout the life of the contract."

Id. AAA denied the forgery allegations and requested "details or other information regarding this assertion" so that it "could undertake an appropriate investigation." Id. The contracting officer did not respond to AAA's request. Instead, one week later, on August 9, 2011, the

contracting officer found AAA nonresponsible due to an unsatisfactory performance record and a lack of business ethics and integrity, listing instances of AAA's alleged nonperformance during the HNT contract -- including forged TMRs.   AR 1154-65.   AAA never received details regarding these forgery allegations in the context of its responsibility determination and did not have an opportunity to respond to these allegations.

On September 22, 2011, over a month after AAA had been found nonresponsible for the NAT procurement, the SDO notified AAA that it was being proposed for debarment based upon allegations of forged TMRs.  Def.'s Mot. for J. upon the Admin. R. App. 1.  After AAA received details of the allegations in the debarment proceeding, AAA responded that the sworn statements relied upon by the Army to allege forgery were unsupported and inaccurate.  Pl.'s Reply Ex. 2. AAA submitted that it had performed the missions relating to the TMRs in question and provided verified copies of the TMRs and ITV "snapshots" indicating that its convoy movement was accurately reflected by the TMRs.  Pl.'s Reply Exs. 2, 3.

On February 29, 2012, the SDO terminated AAA's proposed debarment, and it is this document, along with AAA's submissions to the SDO, that AAA seeks to add to the record.  In the decision terminating the proposed debarment, the SDO concluded that "Army records and statements [were] insufficient to prove fraud."  Pl.'s Reply Ex. 1, at 6. The SDO explained:

> First, there was neither direct nor circumstantial evidence to prove that AAA or any of its employees had actually forged unit signatures on TMRs or filed false claims.  Second, statements by fuel point representatives claiming lack of unit records to verify some AAA fuel deliveries are insufficient to prove fraud, since the evidence reveals that the lack of unit records may have been due to other causes, such as misplaced or lost records, or fuel missions re-directed to other locations.

Id.

Because the contracting officer relied on the referral for proposed debarment in finding AAA nonresponsible, the Court agrees that the SDO's decision terminating the proposed debarment, as well as AAA's submissions to the SDO, are necessary for effective judicial review.  Absent the SDO's decision and AAA's response to the allegations, the record would be erroneous and misleading.  Refusing to permit supplementation here would perpetuate error by allowing what the Government admitted was an unsupported allegation to form a predicate for AAA's nonresponsibility determination.

This Court recognizes that admitting a post hoc agency determination into the record in a bid protest is highly unusual.  However, in this instance, the post hoc decision is not that of the contracting officer offering a different rationale or new justification for her nonresponsibility determination.  See Arch Chems., Inc. v. United States, 64 Fed. Cl. 380, 387 (2005) ("[I]t is not post hoc *documents*, but post hoc *rationalizations*, that give courts particular concern."); Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508

(2003) (stating that post-decisional justifications by an agency "should be offered limited importance in the court's analysis") (citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419 (1971)).   Rather, the SDO's decision terminating the proposed debarment is the Government's own determination that AAA's referral for debarment was unsupported based on the same allegations of forgery cited by the contracting officer as a reason for her nonresponsibility finding.

As courts have recognized, post-decisional information correcting erroneous assumptions, predictions, or facts forming the predicate for agency decision-making must be added to the administrative record to permit effective judicial review.   In the context of agency rulemaking, the D.C. Circuit has recognized that while "[a] reviewing court must tread cautiously in considering events occurring subsequent to promulgation of a rule . . . , testimony [that] bears directly upon the plausibility of certain predictions made by the Administrator in promulgating the Regulations . . . shall [be] accept[ed] . . . into the record." Amoco Oil Co. v. EPA, 501 F.2d 722, 729 n.10 (D.C. Cir. 1974).   Similarly, supplementation of the record with post-decisional information is appropriate if "the Agency proceeded upon assumptions that were entirely fictional or utterly without scientific support." Ass'n of Pac. Fisheries v. EPA, 615 F.2d 794, 811-12 (9th Cir. 1980); see also AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 366 (2009) ("Allowing a protest to be decided upon an AR which does not reflect what actually transpired would perpetuate error and impede and frustrate effective judicial review."); Conservation Law Found. of New England, Inc. v. Clark, 590 F. Supp. 1467, 1474-75 (D. Mass 1984).   Here, the extra-record material AAA proposes to include in the AR directly refutes assumptions underlying the contracting officer's responsibility determination -- that "forged TMRs . . . demonstrate[] AAA's integrity issues and lack of business ethics." AR 1159 (emphasis added).

In the context of a bid protest, it is particularly appropriate that judicial review be informed by an ancillary final debarment decision where the contracting officer only had the benefit of a preliminary decision.   Here, at the time the nonresponsibility determination for AAA was performed, the contracting officer only had the notice of proposed debarment, which represented the initiation of the debarment proceeding, not the final resolution, as the debarment process was still running its course.[12]   The contracting officer assumed the veracity of allegations in the notice of proposed debarment, but the Government itself later concluded that such assumptions were unwarranted when it terminated the proposed debarment.   The contracting officer did not merely rely upon AAA's referral for debarment when making her nonresponsibility determination, she also credited the allegations in the referral, using the following language:

> The following are a listing of the events that impact AAA's Integrity and Business Ethics and show a systemic pattern of fraudulent behavior and activity:

---

[12]   Although the contracting officer had the benefit of the notice of proposed debarment at the time of her responsibility assessment, AAA did not.   AAA was not informed it was being proposed for debarment until September 22, over a month after its August 9, 2011 nonresponsibility determination.   Def.'s Mot. for J. upon the Admin. R. App. 1.

. . .

d)  As provided in paragraph e, below, reported reoccurring instances of submission of forged TMRs under [the HNT contract] <u>demonstrates</u> AAA's integrity issues and lack of business ethics.  AAA's implementation of corrective plans <u>did not prevent the repeated offenses</u> over the last two years and <u>further validates</u> AAA's inability to successfully manage its employees and subcontractors.

e)  On 13 Jul 2011 a referral for proposed debarment of AAA was submitted by [a military task force] based on what they cited as numerous acts of criminal misconduct such as forgery and false claims, and violations of Title 18 USC 495 and 287 in performance under contract W91B4N-10-D-5000[.]  [This] <u>further substantiates</u> AAA's integrity issues and lack of business ethics.

AR 1157, 1159 (emphasis added).  In light of these statements, the record must be corrected in order to ensure an accurate basis for judicial review.

Although the contracting officer cannot be faulted for not considering what she could not have known -- that the Army's Suspension and Debarment Official would conclude that the proposed debarment and allegations of forgery were unsupported -- that does not mean that this Court should ignore this significant development in adjudicating this bid protest at this point in time.  The fact that the contracting officer did not know the notice of proposed debarment would be withdrawn or that the forgery allegations were unsupported does not mean that this Court must put blinders on and ignore these facts now.  <u>See</u> <u>Am. Petrol. Inst. v. EPA</u>, 540 F.2d 1023, 1034 (10th Cir. 1976) ("[E]vents indicating the truth or falsity of agency predictions should not be ignored."); <u>Amoco Oil Co.</u>, 501 F.2d at 729 n.10 (stating that "by the time judicial review is secured events may have progressed sufficiently to indicate the truth or falsity of agency predictions.").

There is another ground for permitting supplementation of the record here.  Plaintiff contends that the contracting officer acted arbitrarily and capriciously in failing to afford AAA an opportunity to respond to the forgery allegations in the context of the responsibility assessment, and thus failed to consider "all relevant factors" before forming her final determination with respect to the forged TMRs.  As courts have recognized, consideration of evidence not in the record is appropriate "'in order to determine whether the agency considered all of the relevant factors.'"  <u>Nat'l Mar. Safety Ass'n v. Occupational Safety & Health Admin.</u>, 649 F.3d 743, 753 n.14 (D.C. Cir. 2011) (quoting <u>Am. Wildlands v. Kempthorne</u>, 530 F.3d 991 (D.C. Cir. 2008)); <u>IMS, P.C. v. Alvarez</u>, 129 F.3d 618, 624 (D.C. Cir. 1997).  Here, after being notified of the forgery allegations by the NAT contracting officer, AAA advised her that it had never heard of such allegations under the HNT contract and requested "any details or other information regarding [the allegations]" so that it could "undertake an appropriate investigation."  AR 1008.  The contracting officer never responded to AAA's request, instead proceeding to determine AAA nonresponsible just one week later.  AR 1154-62.  In order to provide effective

judicial review of this claim, the Court must allow supplementation of the AR to assess whether the contracting officer erred in failing to consider AAA's position on these alleged forgeries. See Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not.").

As such, the proposed debarment materials are necessary for effective judicial review.

**The Parties' Motions for Judgment on the Administrative Record**

**The Contracting Officer Unreasonably Relied on Instances of Alleged Forgeries In Finding AAA Nonresponsible**

In determining AAA nonresponsible for lacking a satisfactory record of integrity and business ethics, the contracting officer found:

> d) As provided in paragraph e, below, reported reoccurring instances of submission of forged TMRs under [the HNT contract] demonstrates AAA's integrity issues and lack of business ethics. AAA's implementation of corrective plans did not prevent the repeated offenses over the last two years and further validates AAA's inability to successfully manage its employees and subcontractors.

> e) On 13 July 2011 a referral for proposed debarment of AAA was submitted by [a military task force] based on what they cited as numerous acts of criminal misconduct such as forgery and false claims, and violations of Title 18 USC 495 and 287 in performance under contract W91B4N-10-D-5000[.] [This] further substantiates AAA's integrity issues and lacking business ethics.

AR 1159.

Plaintiff contends that the contracting officer acted unreasonably in concluding that there had been recurring instances of forged TMRs under the HNT contract when 1) there had been no allegations of forgery during AAA's performance of the HNT contract -- no cure notices, no letters of concern and no corrective action requested -- and 2) AAA denied the allegations and requested details so it could conduct an investigation, but the contracting officer did not grant this request. AR 1008. The Court agrees. This combination of circumstances should have raised a red flag and at least prompted the contracting officer to permit AAA to investigate and to respond to the reported allegations of forgery.

In response to these serious allegations, AAA not only denied the forgeries but asked for clarification so it could investigate and respond in the context of the responsibility determination. Instead of granting AAA's request and obtaining a fuller picture of an anomalous situation, the

16

contracting officer proceeded apace with her nonresponsibility determination and issued that determination just seven days after AAA requested that the Army provide some basis for the forgery allegation.   Yet there is nothing in the record to indicate that this nonresponsibility determination had to be made on an expedited basis.   The HNT contract was still being performed, and there were a number of other potential awardees for this multiple-award contract. This rush to judgment without obtaining a more complete picture of what transpired was arbitrary and capricious.   See Schwendener/Riteway Joint Venture, B-2508625 et al., 1993 WL 67747, at *5 (Comp. Gen. Mar. 4, 1993) (holding that contracting officer's determination that bidder lacked experience was unreasonable where bidder in fact had the necessary experience, and where information in the record was "sufficient . . . to put the contracting officer on notice to inquire further"); cf. Kilgore Flares Co., B-292944 et al., 2003 WL 23152988, at *8 (Comp. Gen. Dec. 24, 2003) (upholding a responsibility determination because "unlike Schwendener, this is not a matter where the agency was misunderstanding the facts before it, and failing to take opportunities to learn the complete story").

Indeed, once the suspension and debarment official considered AAA's position and probed the forgery allegations, a wholly different picture emerged.   The SDO, reviewing a more extensive record -- including affidavits from Army personnel, additional investigative reports, and material submitted by AAA -- found that there was "neither direct nor circumstantial evidence to prove that AAA or any of its employees had actually forged unit signatures on TMRs or filed false claims."  Pl.'s Reply Ex. 1, at 6.  Statements from Army investigators indicated that 179 TMRs alleged to have been forged by AAA were lost or misplaced by the Army itself.  Id. Over one dozen instances of alleged forgery were disproven when the Army admitted that AAA had successfully completed the missions, or when AAA produced copies of the TMRs showing that no forgery had occurred.  Id. at 6-7.  The SDO also determined that additional allegations of forgery were premised upon contradictory statements by Army personnel.  Id. (discrediting seven allegations by Army representatives that signatures on TMRs were forged after AAA produced many of the TMRs in question and demonstrated either that other Army personnel signed the TMRs or that some of the TMRs were reported missing by the Army).   AAA also produced several ITV "snapshot records," tables listing information pertaining to each mission, including TMR number, upload date, ITV transponder number, and the status of the mission sheet, supporting its position that its fuel trucks arrived at their delivery locations.  Id. at 7.

This Court does not, of course, charge the NAT contracting officer with knowledge she did not have in performing AAA's responsibility assessment.  Rather, the Court simply holds that the contracting officer should have obtained additional information given the unusual circumstances -- serious allegations of forged TMRs had appeared for the first time in a notice of proposed debarment, yet involved TMRs that the HNT contracting officer had monitored for two years but never brought to AAA's attention.

The Court recognizes that the notice of proposed debarment was supported by a CID investigative report whose author had "obtained copies of sworn statements and forged [TMRs] . . . which had been originated at various military bases throughout Afghanistan."  AR 1230.  The CID report further stated that AAA had submitted 124 forged TMRs for a total of $3,660,000.

Id.  Ordinarily, a contracting officer can rely on investigative reports coupled with an ensuing notice of proposed debarment in conducting a responsibility determination.  See e.g., Frank Cain & Sons, Inc., B-236893, 1990 WL 277550, at *2 (Comp. Gen. June 1, 1990) (recognizing that a U.S. Army Criminal Investigation Division report may be used as the basis of a nonresponsibility determination without an independent investigation by the contracting officer to substantiate the accuracy of the report); Energy Mgmt. Corp., B-234727, 1989 WL 240948, at *3 (Comp. Gen. July 12, 1989) (acknowledging that the Army had reasonable grounds for finding that contractor lacked integrity and was nonresponsible based on CID report information).  Here, however, it was odd that the HNT contracting officer had never identified even a single instance of alleged forgery over a two-year period nor attempted to recoup over $3.6 million from AAA under the HNT contract.  This stands in stark contrast to the HNT contracting officer's course of dealing with respect to other allegations under the HNT contract.  The HNT contracting officer consistently issued letters of concern and cure notices for other infractions such as failure to meet PSC arming requirements and noncompliance with ITV utilization rate requirements.  Further, the HNT contracting officer withheld $2,971,786.10 from AAA for a combination of failed or cancelled missions, pilferage/backcharges and fuel backcharges.  AR 1158.

The contracting officer's reliance upon the forgery allegations was arbitrary, capricious, and irrational in another respect.  The contracting officer erred in concluding that AAA's "corrective actions" regarding the forgeries had been inadequate when there had been no corrective action implemented in the first place.  AAA had never been notified that it had an issue with forgeries, so there was no reason for AAA to initiate corrective action.  Thus, the contracting officer's reference to "AAA's implementation of corrective plans" was blatantly incorrect.  See AR 1159.  The contracting officer made the following finding which was wholly unsupported by the record:  "AAA's implementation of corrective plans did not prevent the repeated offenses over the last two years and further validates AAA's inability to successfully manage its employees and subcontractors."  Id.  Given that there had been no "corrective plans," this predicate for the contracting officer's nonresponsibility determination cannot stand.

Plaintiff has failed to prove, however, that the contracting officer's conclusions in AAA's responsibility determination were arbitrary and capricious with respect to other areas of its HNT contract performance, including ITV utilization rates, failed missions, and improper payment allegations, with the exception of transponder stacking.  The Government has conceded that the contracting officer's finding of "reoccurrence" of transponder stacking was an error, unsupported by record evidence.  See Def.'s Mot. for J. upon the Admin. R. 31.  AAA engaged in only one instance of transponder stacking.  Id.

## AAA Was Prejudiced by the Contracting Officer's Reliance on the Proposed Debarment

Although it is difficult to ascertain the extent to which the referral of proposed debarment and alleged forgeries colored the contracting officer's assessment regarding AAA's nonresponsibility, the nonresponsibility determination itself indicates that this referral and the allegations of forgery played a significant role in her ultimate determination.  At the conclusion

of the responsibility determination, the contracting officer expressly referenced the referral for debarment as a basis for determining that AAA failed to meet the FAR responsibility criteria:

> [The HNT Contract], upon which this determination is primarily based, was awarded in November 2009 with areas of concern formally initiated in February 2010 and continuing throughout the life of the contract. This demonstrated trend of problematic performance <u>coupled with Task Force 2010 formal referral for AAA's debarment on the basis of forgery and false claims</u> substantiate that AAA does not meet the criteria of FAR 9.104-1, with emphasis on criteria FAR 9.104-1 (b), (c), (d), and (e) for purposes of being determined a responsible contractor. While negative information was not found against every element, significant negative information was found in relation to subparagraphs FAR 9.104-1(b), (c), (d), and (e).

AR 1161 (emphasis added). Importantly, the contracting officer characterized the allegations of forged TMRs and the referral of proposed debarment as a significant issue, stating that "significant negative information was found in relation to subparagraph FAR 9.104-1 . . . (d), and (e)." Subparagraphs (d) and (e) only addressed the forgeries, the so-called "corrective plans," and the notice of proposed debarment -- they referenced no other performance issues.

The Court recognizes that the contracting officer identified additional areas of AAA's noncompliance under the HNT contract in her nonresponsibility assessment, including noncompliance with PSC requirements, specifically noncompliance with providing correct and complete armed employee authorization packages and registration in the Synchronized Predeployment Operational Tracker database; persistent failure to comply with ITV utilization requirements; millions of dollars in withheld funds for a combination of failed missions, canceled no-pay missions, pilferage/backcharges, and fuel backcharges; and attempted bribery using AAA's CEO's email address. AR 1154-62. Additionally, the contracting officer referred to a May 2010 letter of concern "citing that the Government made repeated attempts to contact AAA's Operation Center via phone and email that were unsuccessful and fourteen (14) trucks failed to arrive at mission origination points" in her discussion of AAA's performance record pursuant to FAR 9.101-1(e). AR 1159-60. It is not clear from the record whether these other incidents, without consideration of the proposed debarment or alleged forgeries, would have provided a sufficient basis for the contracting officer to find AAA nonresponsible.

Because the contracting officer's erroneous conclusions that AAA forged TMRs, failed to take corrective action, and engaged in reoccurring incidents of transponder stacking, cannot support the nonresponsibility determination, the Court remands the matter to the contracting officer for a reevaluation of AAA's responsibility without regard to these matters. Here, acknowledging subsequent developments will allow the contracting officer on remand to take stock of the Government's own considered decision terminating the proposed debarment. Pragmatic circumstances in the instant procurement mandate this result. AAA, if found responsible at this juncture, would be eligible for an award and could perform the remainder of the contract, which could extend until October 31, 2013. <u>See</u> AR 322-27.

**Allegations of Disparate Treatment**

Plaintiff further alleges that the contracting officer improperly found AAA to be nonresponsible by treating it in an unequal and disparate manner as compared to one other offeror, Anham LLC ("Anham"), another HNT contractor that was deemed responsible. Specifically, AAA contends that although AAA and Anham were similarly situated offerors with nearly identical HNT contract performance problems and comparable responses addressing performance concerns, the NAT contracting officers evaluated AAA and Anham differently with respect to responsibility.[13]

As an initial matter, contracting officers are obligated to treat all offerors equally, "evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am., Inc. v. United States, 56 Fed Cl. 377, 383 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004); FAR 1.602-2(b) ("Contracting officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment . . . ."). Indeed, "an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996). This fundamental principle of equal treatment is applicable in the context of a responsibility determination. Although responsibility determinations must be tailored to the unique situation of a given offeror, a comparison of these two offerors' responsibility determinations is feasible because AAA and Anham performed the same HNT contract, which was exclusively used to measure responsibility for the NAT procurement. The contracting officer's final responsibility determination for Anham acknowledges the comparative nature of the responsibility determination: "By comparing Anham's performance under the HNT contract with the other HNT contractors, all performance records can be seen in the same overall context -- all contractors agreed to provide the same services in the same locations given the same conditions." AAA 5.

Plaintiff alleges that the contracting officer's review of AAA's record in several areas of performance on the HNT contract was arbitrary and capricious in light of Anham's determination of responsibility.[14] Plaintiff has failed to prove, however, that AAA and Anham had sufficiently similar HNT performance records.

---

[13] The responsibility determinations for AAA and Anham were performed by different contracting officers. Salia Price performed AAA's assessment, and Dale Van Dyke performed Anham's. AR 1154-62; AAA 2-10.

[14] Plaintiff also alleges that the Army applied disparate standards in assessing AAA's and Anham's performance records with respect to transponder stacking and forged TMRs. As explained above, the Court concluded that the contracting officer erred in finding that AAA engaged in reoccurring instances of transponder stacking and that AAA forged TMRs and is instructing the Army to reevaluate AAA for responsibility without considering these matters. As such, the Court does not reach the issue of whether transponder stacking and forged TMRs also evidence disparate treatment.

**Private Security Arming Requirements**

Although Plaintiff claims that the Army applied disparate standards when evaluating compliance with private security arming requirements, this allegation fails because Anham complied with the HNT contract's private security arming requirement, while AAA was consistently noncompliant until August 2011.

The Army issued a letter of concern dated February 1, 2010, to all HNT contractors for failure to meet private security arming requirements. AR 25508. Anham responded that it believed it had complied with the contract's private security arming requirements. AR 25509-10. Anham's final responsibility determination noted that "[a]fter discussing the arming authority requirements with the Armed Contractor Oversight Division, Anham was the only HNT contractor to comply with the arming authority clause." AAA 3.

By contrast, AAA was notified on multiple occasions that it had failed to comply with this requirement. After the first letter of concern on February 1, 2010, the Army issued a second letter of concern to AAA on May 14, 2011, and subsequently issued a cure notice to AAA on July 2, 2011. AR 1204, 1185-86. In the cure notice, the contracting officer noted AAA's persistent difficulties with meeting the contract's arming requirements clause, and stated that "this issue still has not been resolved." AR 1185. AAA claimed in its July 11, 2011 reply that "the issue is near resolution." AR 1195. Not until August 2, 2011, close to the September, 2011 end of the HNT contract, did AAA state that it was compliant with this requirement. AR 1003. Based on this evidence, it was reasonable for the contracting officer to conclude AAA's responsibility determination that (a) AAA had been "notified on three (3) occasions, . . . [and] failed to comply with the Private Security Contractor arming requirements" and (b) that "AAA's lack of compliance with PSC arming requirements does not provide the Government confidence in AAA's safety programs." AR 1157, 1160.

**ITV Utilization**

Plaintiff alleges that even though both Anham and AAA increased their ITV utilization over the course of the HNT contract, they were evaluated differently for this concern. The record does not contain complete ITV utilization data for both contractors throughout the period of HNT contract performance. However, the record indicates that near the beginning of HNT contract performance, Anham's average ITV use rate was 60%. See AR 25500-01 (stating in letter of concern dated December 22, 2009, that "Anham has an average of 60% ITV transponder utilization rate in this 4-week period."). By contrast, some nine months later in September 2010, AAA's average ITV use rate was 11.98%. See AR 1178 ("AAA's ITV usage for the month of September 2010 was 11.98%.").

Nonetheless, Plaintiff contends that its ITV utilization improved significantly over the HNT contract. As support for this claim, AAA points to its ITV data for the 13-week period between April 16, 2011, and July 9, 2011. Pl.'s Mot. for J. on the Am. Admin. R. 27. During this period, AAA's ITV utilization rate fluctuated between 72% and 93%. However, for the

same period of performance, Anham's ITV usage rates were higher.  Anham's ITV utilization rate was 100% for each week in this period, with two exceptions -- on June 25, 2011, it was 98.43% and on July 2, 2011, it was 99.55%.  AR 1049-61.  Moreover, during this period of improved ITV usage, AAA received a cure notice from the Army dated July 2, 2011, stating that "AAA's GDMS utilization is consistently below the 100% utilization rate required in the Statement of Work."  AR 1185.

The contracting officer concluded in Anham's responsibility determination that "Anham's use of in transit visibility system greatly improved over the life of the contract and [Anham] was a top performer regarding this metric." AAA 4. In AAA's responsibility assessment, the contracting officer cited four letters of concern and a cure notice that were issued to AAA.  AR 1158, 1160.  These notices from the Army indicate that AAA's corrective action had not remedied its ITV performance problems consistently.  Accordingly, it was reasonable for the contracting officer to conclude that AAA's corrective actions "did not prevent reoccurrence" and evidenced AAA's "lack of quality assurance and operational controls."  AR 1160.

In light of this evidence, Plaintiff has failed to demonstrate that Anham and AAA were similarly situated with respect to ITV use.

### Withheld Payments

Plaintiff also alleges that the contracting officer applied disparate standards when evaluating withheld payments.  Although Anham's total amount of withheld payments was approximately $5.6 million, the relevant amount for purposes of the responsibility determination was approximately $1.4 million -- the amount attributable to Anham's performance failures after subtracting the amount attributable to missions cancelled for the Government's convenience. AAA 5.  For AAA, the total amount of payments withheld was approximately $2.9 million, but approximately $2.8 million was attributable to AAA's performance failures.   AR 1158.  Although Plaintiff asserts that withheld payments expressed as a percentage of total invoice amounts for each contractor -- 2% for Anham and 3% for AAA -- are not dramatically different, the withheld payments attributable to AAA's performance failures totaled twice the amount withheld from Anham.  Plaintiff has failed to establish disparate treatment with respect to withheld payments.

### Failed Missions

Plaintiff further alleges that its nonresponsibility determination was unreasonable in light of Anham's failed missions record, citing AAA's eight failed fuel missions as compared to Anham's 62.  Pl.'s Mot. for J. on the Am. Admin. R. 24.  However, Plaintiff ignores the fact that the contracting officer assessed the HNT contractors in terms of the total amount of withheld payments, which encompassed failed mission payments, pilferage, and backcharges.  The dollar value attributable to failed missions was but one factor in the computation of the total amount of withheld payments for each contractor.  AR 25526.  Thus, while AAA's record was better than Anham's in terms of the dollar value of withheld payments for failed missions -- AAA had

$708,000 of withheld payments for failed missions while Anham had $5,343,246.44 -- AAA was charged a larger amount of pilferage/back charges and fuel back charges than Anham.  Id. Specifically, AAA was assessed $2,263,786.10 in withheld payments on this basis, while Anham had a total of $238,158.91.  Id.  Plaintiff has failed to establish disparate treatment by isolating failed missions.

### HNT Contract Default and Fuel Deliveries

Plaintiff also contends that the Army could not reasonably find AAA nonresponsible and Anham responsible when Anham refused to accept fuel delivery missions and AAA continued to provide fuel support services.  Plaintiff claims that Anham defaulted on HNT contract requirements when it rejected fuel missions, yet AAA, which never refused fuel missions, was deemed nonresponsible.  However, Anham's responsibility determination does not state that Anham defaulted on HNT contract requirements.  Rather, AAA points to statements made in August 2011 by Dale Van Dyke, the contracting officer who performed Anham's responsibility determination, that Anham had "repeatedly defaulted on the HNT contract" as support for its claim.  See Decl. of Dale Van Dyke ¶ 11(f), Aug. 22, 2011.[15]

Contrary to the August 22, 2011 Van Dyke declaration, the record does not support a conclusion that Anham was in default of the contract requirements.  The Army issued two cure notices to Anham.  By letter dated January 1, 2010, the Army informed Anham that "the Government considers your failed delivery of the following requirement items specified under [the HNT contract] as a direct act of default."  AR 25504.  The letter listed several deliverables, including a safety plan, proof of insurance, quality control plan, and list of armed personnel, among others.  Id.  However, Anham's response indicated that it had submitted the required deliverables, and the Government subsequently retracted the cure notice on January 9, 2010[16], stating "following subsequent research by the Government, it became apparent that Anham LLC had submitted each deliverable required in a timely manner."  AR 25505-07.

On July 5, 2011, the Army issued a second cure notice to Anham, stating that Anham could not refuse missions to "no-go" areas.  AR 25518-19.  This cure notice stated:

1.  You are hereby notified that the Government considers your lack of compliance and failure to perform in accordance with paragraphs 2.0.4.3; 4.1 and 4.5.1 of the

---

[15] Mr. Van Dyke's declaration was prepared for this litigation for the purpose of clarifying whether the HNT contract could be extended beyond its termination date of September 15, 2011.  Mr. Van Dyke's declaration was attached as an exhibit to both the Government's position paper filed on August 22, 2011, and to the Defendant's cross-motion for judgment upon the administrative record filed on October 4, 2011.

[16] The memorandum was dated January 9, 2009, but should have been dated January 9, 2010.

Statement of Work (SOW) of the subject contract for Host Nation Trucking (HNT) services as a direct act of default.

2. Host Nation Trucking Contractors are responsible for ensuring personnel, trucks and equipment are able to travel on any route, to and from any location within Afghanistan as directed on Transportation Movement Requests issued by the 313th Joint Movement Control Battalion, in accordance with paragraphs 2.0.4.3; 4.1 and 4.5.1 of SOW . . . .   Refusing missions to "no-go" areas is not authorized in the contract terms.

Id.  In response, Anham indicated that it "has always been ready, able and willing . . . to perform missions throughout Afghanistan pursuant to its contractual requirements."  AR 25520-22.  The Army responded by retracting the cure notice on July 13, 2011, explaining that "[t]he reason for issuing the cure notice was the apparent abuse of NO GO areas by HNT carriers.  The Government has reviewed your response and agrees that [Anham] has not defaulted on any aspect of performance on the contract."  AR 25523.

Thus, at the time of Anham's responsibility determination in February, 2012, the Army had retracted the cure notices issued to Anham on January 9, 2010, and on July 13, 2011.  AR 25507 (memorandum dated January 9, 2010, signed by Lieutenant Colonel David A. MacIntyre retracting January 1, 2010 cure notice); 25523 (memorandum dated July 13, 2011, signed by Major Edward C. Gosline retracting July 5, 2011 cure notice).  Therefore, there was no basis for the contracting officer to conclude that Anham had defaulted on the HNT contract's requirements.

Plaintiff claims that Anham's refusal to make fuel deliveries was an act of default.  However, the Army retracted the cure notice issued to Anham based on its failure to make deliveries and expressly stated that Anham was not in default.  It is not the Court's province to declare an offeror in default on a prior contract not at issue here when the Government has not found that contractor to have been in default.  In seeking to have this Court second guess the Government's evaluation of Anham's performance of the HNT contract, Plaintiff is straying far beyond the matter at hand -- AAA's responsibility determination.  Plaintiff comes perilously close to attacking Anham's responsibility determination -- a matter it has not raised as a ground of protest and a matter it would lack standing to challenge.  Indeed, the question of whether Anham has complied with a contractual requirement -- accepting missions -- is a contract administration matter under the HNT contract and not a matter this Court should adjudicate in the context of a bid protest.  See Chapman Law Firm v. United States, 63 Fed. Cl. 519, 527 (2005), aff'd, 163 F. App'x 889 (Fed. Cir. 2006)) (finding that compliance with contractual bonding requirement is a matter of contract administration, not an error in the procurement process).

**Pilferage**

Plaintiff alleges that AAA's pilferage issues were not as egregious as Anham's and claims that this too is evidence of disparate and unequal treatment.  Anham's responsibility determination indicates that $377,877.30 had been withheld from Anham for four missions in which dry cargo, including an all-terrain gator vehicle, generators, and radios, was missing upon delivery.  AAA 6; see also AR 25827, 25839, 25885, 25889.  Anham claimed that "this missing cargo was a result of insurgent activity rather than any company misconduct."  AAA 6.  In Anham's responsibility determination, the contracting officer accepted the findings of a CID report dated October 28, 2011, which determined that there was insufficient evidence to conclude that the pilfered cargo was attributable to misconduct by Anham.  AAA 6.  The CID report dated October 28, 2011, is not in the record, although the record contains three other CID reports finding that unidentified persons -- not Anham -- were responsible for some of these thefts.  See AR 25828, 25840, 25893.  Nevertheless, as Plaintiff notes, the Army submitted requests to backcharge Anham for the missing cargo because it had determined Anham was at fault.  See AR 25827, 25839, 25885, 25889.

Even if Anham had been at fault for some missing cargo, however, Anham was assessed a lower amount of withheld payments for pilferage/backcharges than AAA; $238,158.91 was withheld from Anham for pilferage/backcharges, while $998,143.75 was withheld from AAA for pilferage/backcharges.  AR 25526-28.

In sum, because Plaintiff has failed to prove that AAA's and Anham's performance deficiencies under the HNT contract were similar, AAA's nonresponsibility determination does not evidence disparate treatment.

## AAA's Allegations of Disparate Treatment Based Upon the Classified Amended Administrative Record

AAA further alleges disparate treatment based upon the classified portions of the Amended AR.  The entire discussion of these allegations is contained in the Classified Addendum, filed this date.

## AAA is Entitled to a Declaratory Judgment and Injunctive Relief

AAA has demonstrated that the government unreasonably relied on allegations of forgery contained in a referral for proposed debarment -- even though forgeries had never been mentioned during AAA's HNT performance, and the contracting officer never provided AAA with any details of the forgeries or afforded AAA an opportunity to respond.  In addition, the contracting officer found that AAA's corrective action was deficient when no corrective action had been taken or requested.  Finally, the Government conceded that the contracting officer erred in concluding that AAA engaged in more than a single instance of transponder stacking.  Because these unreasonable conclusions taken together had an impact on AAA's

nonresponsibility determination, the Court vacates this determination and remands the matter to the contracting officer for reevaluation without consideration of these matters.

To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest.  See FMC Corp. v. United States, 3 F.3d 424, 426 (Fed. Cir. 1993); Gentex Corp. v. United States, 58 Fed. Cl. 634, 654 (2003); Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000). No one factor is dispositive, and "the weakness of the showing regarding one factor may be overborne by the strength of the others."  FMC Corp., 3 F.3d at 427.

Because AAA has succeeded on the merits of its case with respect to the contracting officer's conclusions regarding forgery, proposed debarment, and transponder stacking, the first factor for injunctive relief weighs in AAA's favor.  AAA will also suffer irreparable harm, absent a reevaluation of its responsibility.  This Court has repeatedly held that a protestor suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract.  See CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390–391 (2010); Serco, Inc. v. United States, 81 Fed. Cl. 463, 501-02 (2008); Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 524 (1991) (bidder would be irreparably harmed because it "could recover only bid preparation costs, not lost profits, through an action at law").  Here, AAA's responsibility was evaluated using erroneous conclusions that it had forged TMRs, that these forgeries were a recurring problem, and that AAA's nonexistent corrective action was deficient -- all without affording AAA an opportunity to respond to so-called past performance deficiencies which had never been raised before.

In considering whether the balance of the hardships tips in favor of a protestor, a court must balance the potential harm to the protestor of not granting the injunction against the potential harm to both the Government and the awardees should the injunction be granted.  ES-KO, Inc. v. United States, 44 Fed. Cl. 429, 435 (1999).  Defendant argues that it will be harmed by an injunction because "AAA's perpetual performance failures under the HNT contract and its ethics problems establish that having AAA as a NAT contractor would be a significant harm to the Army and the war effort in Afghanistan, not a benefit."  Def.'s Mot. for J. upon the Admin. R. 38.  However, the Court is not ordering the Army to award AAA a NAT contract, but is instead remanding the determination of AAA's responsibility to the Army.  The time and expense that this reevaluation will require is outweighed by the harm AAA would suffer if it is not properly evaluated for responsibility.

Finally, the Court finds that an injunction will serve the public interest, noting that "[i]t is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes

and regulations." CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (2004) (citing United Int'l Investigative Servs. Inc., 41 Fed. Cl. at 323).

As such, the Court issues a limited injunction mandating that the Army reevaluate AAA's responsibility and award AAA a contract if the Army determines AAA to be responsible.

## Conclusion

1. Plaintiff's Motion to Supplement the AR is **GRANTED**.  The following documents are added to the record: the decision of the Army Suspension and Debarment Officer ("SDO") terminating the proposed debarment of AAA, AAA's Response to the Notice of Proposed Debarment, AAA's slide presentation to the SDO, and documents cited in AAA's Response to Notice of Proposed Debarment.  See Pl.'s Reply Ex. 1, 2, 3, and accompanying binder.

2. Plaintiff's Motion for Judgment on the AR is **GRANTED in part.**

3. The Court **GRANTS** Plaintiff's request for a declaratory judgment and Motion for a Permanent Injunction as follows:

    (a) AAA's nonresponsibility determination is declared null and void and is vacated.

    (b) The Court remands this matter to the Army to reevaluate AAA's responsibility without considering the Notice of Proposed Debarment, alleged TMR forgeries or reoccurrence of transponder stacking, consistent with this opinion.

    (c) The Army shall complete its reevaluation of AAA's responsibility within 45 days from the date of this opinion.

4. Defendant's Cross-Motion for Judgment on the AR is **DENIED**.

5. The Clerk is directed to enter judgment on the AR in favor of Plaintiff consistent with this opinion.

6. Prior to the release of this opinion to the public, the parties shall review this opinion for competition-sensitive, proprietary, confidential, or other protected information.  The parties shall file proposed redacted versions of this decision by **October 10, 2012**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**